IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ALYSHA ROSEKELLY,<br><br>                    Plaintiff,<br><br>vs.<br><br>TESSENDERLO KERLEY, INC.,<br><br>                    Defendant. | CV 16-176-BLG-SPW-TJC<br><br>**FINDINGS AND<br>RECOMMENDATION OF U.S.<br>MAGISTRATE JUDGE** |

Plaintiff Alysha Rosekelly brings this action against Defendant Tessenderlo Kerley, Inc. ("TKI") for wrongful discharge.  (Doc. 3.)

Judge Watters has referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B).  (Doc. 8.)  Presently before the Court is TKI's Motion for Summary Judgment.  (Doc. 16.)  The motion is fully briefed and ripe for the Court's review. (Docs. 17, 20, 24.)

Having considered the parties' submissions, the Court **RECOMMENDS** TKI's Motion for Summary Judgment be **GRANTED**, as set forth below.

/ / /

/ / /

/ / /

## I.    FACTUAL BACKGROUND[1]

TKI is a subsidiary of Tessenderlo Group, which is a diversified industrial group that provides products and technologies for agricultural, mining, and water reclamation industries.  (Doc. 21 at ¶ 1.)  Jupiter Sulpher, LLC ("Jupiter Sulpher") is a joint venture between TKI and Phillips 66, and is managed by an executive committee that consists of three members from TKI and three members from Phillips 66.  (*Id.* at ¶¶ 2, 4.)  Through this joint venture, TKI processes sulfur into value-added products at two of Phillips 66's oil refineries, including the refinery in Billings, Montana.  (*Id.*)  TKI handles the day-to-day operations for Jupiter Sulpher.  (*Id.* at ¶ 5.)  Jupiter Sulpher is staffed with individuals who are employed by either TKI or by Phillips 66.  (*Id.* at ¶ 6.)

Plaintiff began working for TKI in February 2012 as the Office Manager at the Billings Jupiter Sulpher facility.  (Doc. 21 at ¶ 9.)  Plaintiff reported to Howard Butler ("Butler"), the Jupiter Sulpher Plant Manager, and to Dana Rowe ("Rowe"), the Jupiter Sulpher Assistant Plant Manager.  (*Id.* at ¶ 10.)  Butler was the only

---

[1] The background facts are taken from TKI's Statement of Undisputed Facts ("SUF"), Plaintiff's Statement of Disputed Facts ("SDF"), and TKI's Reply in Response to SUF and SDF, and are undisputed except where indicated.  (Docs. 18, 21, 25.)  The Court notes that Plaintiff opposes several of TKI's facts by restating the same deposition citations that TKI relied on to support its SUF.  *See e.g.* SUF 13, 22, 32, 35-36, 40, 44-47, 53, 58-61, 66, 68, 70-72, 80.  To the extent Plaintiff's restated citations support the facts as undisputed, they will be deemed admitted, unless otherwise indicated.

Phillips 66 employee at the Jupiter Sulpher facility in Billings.  (*Id.* at ¶ 8.)  Butler reported to Jupiter Sulpher's president, Gregg Roggentine ("Roggentine") and to the Phillips 66 plant manager.  (*Id.*)  Butler did not, at any time, have the authority to terminate Plaintiff's employment.  (*Id.* at ¶ 11.)

As the Office Manager, Plaintiff was primarily responsible for inventory, which included tracking what the plant produced and accounting for outgoing shipments of products.  (Doc. 21 at ¶ 15.)  She was also responsible for coordinating all shipping activities, including making sure products were correctly shipped out of the plant to the right destination, and that raw materials were being received.  (*Id.* at ¶¶ 13, 14.)  Plaintiff's duties also included handling purchase orders, and a variety of other clerical and human resources related tasks.  (*Id.* at ¶ 16.)  Plaintiff's job duties remained the same during the entire time she worked at TKI, with the exception of occasional temporary duties.  (*Id.* at ¶ 21.)

The processing chemicals used by Jupiter Sulpher and the resulting chemical products are often highly toxic, corrosive, and explosive.  (Doc. 21 at ¶ 3.)  As a result, Jupiter Sulpher has substantial safety and environmental compliance requirements that demand precise inventory management.  (*Id.*)

TKI asserts that Plaintiff was provided with extensive training throughout her employment.  (Doc. 21 at ¶¶ 21-27.)  Plaintiff's predecessor, Jollita Besel ("Besel") worked with Plaintiff for a month when she started at TKI.  (*Id.* at ¶ 21.)

Cynthia Lecker ("Lecker"), TKI's Inventory Controller in Phoenix, Arizona provided ongoing training by phone related to Plaintiff's railcar and truck shipment duties and inventory. (*Id.* at ¶¶ 22-23.) Elizabeth Quinton ("Quinton"), Jupiter Sulpher's Controller, provided training to Plaintiff, and traveled to Billings in May 2016 to provide additional in-person training at the Billings plant. (*Id.* at ¶ 24.) Plaintiff also travelled to Phoenix to receive training. (*Id.* at ¶ 26.)

According to Plaintiff, however, the training she received was inadequate, particularly with regard to inventory. (*Id.* at ¶ 104.) Plaintiff states the inventory program used at the Billings plant was different from any other inventory program used in the company nationwide, so there was no one who understood the program who could help her with it. (*Id.* at ¶ 105.) Plaintiff characterizes Quinton's visit to Billings as merely going over numbers, and not training. (*Id.* at ¶ 106.) Despite the parties' disagreement over the nature and quality of Plaintiff's training, Plaintiff acknowledges that she was able to "figure it out" over the course of her employment, and ultimately acquired the knowledge and experience necessary to perform her job duties. (*Id.* at ¶¶ 28, 107; Doc. 18-3 at 20.)

Plaintiff's inventory duties included entering data into two separate computer programs – the Inventory Report Program and SAP. (Doc. 21. at ¶ 30.) Plaintiff input data into the programs that she gathered from shipping reports and from operators who took physical measurements from the storage tanks. (*Id.* at ¶¶

4

32, 111.)  The inventory levels reflected in the two programs were supposed to match.  If not, it was Plaintiff's responsibility to determine the cause of the discrepancy.  (*Id.* at ¶¶ 31, 33.)  Plaintiff testified that she understood it was important to maintain an accurate inventory to address the needs of the plant.  (*Id.* at ¶ 15.)  But Plaintiff disputes that she was solely responsible for inventory, and points out that Butler and Rowe oversaw her inventory duties.  (*Id.* at ¶¶ 15, 112-113, 116-118.)  Plaintiff also asserts that Butler had the ability to use a special password to change the inventory data behind the scenes.  (*Id.* at ¶ 120.)  Plaintiff contends Butler made changes to the inventory on a regular basis to show the plant had produced product it had not actually made, and he referred to the practice as "cookin' the books."  (*Id.* at ¶ 120.)

Approximately one year after she started, on February 19, 2013, Plaintiff was issued a Disciplinary Warning Notice.  (Doc. 21 at ¶ 34; Doc. 18-8.)  The Notice recounted Plaintiff's errors relating to inventory in January 2013.  (Doc. 18-8.)  The Notice stated that Plaintiff's inventory issues had been a repeat problem, the number of mistakes was too high, and the mistakes required others to spend undue time to correct.  (*Id.*)  The Notice stated Plaintiff had been formally counseled on August 1, 2012 regarding her mistakes, but the level of improvement since that time had been too slow.  (*Id.*)

/ / /

5

On March 5, 2013, Butler issued a Performance Evaluation based on Plaintiff's unsatisfactory performance.  (Doc. 21 at ¶ 36; Doc. 18-9.)  The Performance Evaluation documented Plaintiff's mistakes related to her inventory duties.  (Doc. 18-9.)  The evaluation stated Plaintiff's quality of work had been unacceptable, and she was therefore being placed on a Performance Improvement Plan ("PIP').  (*Id.*; Doc. 21 at ¶ 125.)  The PIP required all inventory work to be reviewed by management, and that daily and monthly coaching and feedback would be provided.  (Doc. 18-9.)

On March 29, 2013, Plaintiff contacted Fernando Solano ("Solano"), TKI's Human Resources Director, regarding concerns that she might be terminated over an upcoming leave of absence.  (Doc. 21 at ¶¶ 43, 128; Doc. 21-7.)  Plaintiff explained she was having surgery, and expected to be on leave for a month.  (Doc. 21-7.)  Plaintiff recounted a conversation she had with Butler, where he made a comment that "you had better not get sick anymore," and that upon learning she needed surgery, he stated "I hope you have enough sick time."  (*Id.*)  Solano told Plaintiff she would not lose her job even if she used up all of her sick time.  (*Id.*)

On May 3, 2013, Plaintiff received her annual Performance Evaluation.  (Doc. 21 at ¶ 41; Doc. 18-10.)  At that point, Plaintiff had improved her work performance with regard to some of the mistakes that had previously been identified.  (Doc. 21 at ¶ 126.)  Nevertheless, the evaluation noted Plaintiff

continued to make other mistakes, including that she had not logged 5 railcars of ammonia into inventory for three days, and that she incorrectly coded purchase orders in January and February.  (Doc. 18-10 at 2.)

The next day, on May 4, 2013, Plaintiff called Solano again regarding Butler.  (Doc. 21 at ¶¶ 46, 131; Doc. 21-7.)  Plaintiff reported an incident that occurred the previous week where she made a mistake, and Butler told her "[I]f you make one more mistake you are fired and I have Gregg [Roggentine] and Fernando [Solano]'s approval."  (*Id.*)  Plaintiff told Solano that in her opinion, there were many things she was not properly trained in.  (*Id.*)  Plaintiff also reported that Butler created a difficult work environment because of his anger, temper and mood swings.  (*Id.*)  Solano noted that Butler did not have approval to terminate Plaintiff, and only had authority to guide her through her PIP.  (*Id.*)

Thereafter, TKI opened a formal investigation regarding the concerns Plaintiff raised related to Butler.  (Doc. 21 at ¶ 47.)  As part of the investigation, TKI interviewed Plaintiff, Butler, and other individuals in Billings.  (*Id.* at ¶ 48.)  Based on the investigation, TKI determined Plaintiff's allegations could not be corroborated, but there was an acknowledgment that Butler had some management style issues to work on.  (*Id.* at ¶ 49.)

On February 18, 2014, Plaintiff received her annual Performance Evaluation for the year 2013.  (Doc. 21 at ¶ 141; Doc. 21-13.)  Plaintiff received a "Meets

Expectations" rating on all categories.  (*Id.*)  The Evaluation noted Plaintiff had

made good progress towards being more precise at inventory, and there had been a

positive increase in her understanding of her job and responsibilities.  (*Id.*)  The

Evaluation also stated that due to Plaintiff's "current solid performance and drastic

reduction in 'mistakes,' [Plaintiff] is formally being removed from the

Improvement Plan she was placed on on 3/5/2013.  Well done."  (Doc. 21 at ¶ 142;

Doc. 21-13 at 1.)  Going forward, Plaintiff was to "[c]ontinue to increase her

knowledge of how SAP works in regards to loads, Batch Maintenance, corrections,

and understanding the numbers which go into Plant production tracking."  (*Id.* at

2.)  Plaintiff was also given a 1.5% Merit Bonus.  (Doc. 21 at ¶ 143; Doc. 21-13 at

3.)  Plaintiff was never placed on another PIP.  (Doc. 21 at ¶ 142.)

    On March 27, 2014, Plaintiff contacted Solano regarding another incident

involving Butler.  (Doc. 21 at ¶¶ 52, 144; Doc. 21-8 at 1.)  Plaintiff reported that on

March 25, 2014, Butler came out of his office and asked her a question about an

issue with the transportation department.  (*Id.*)  Before she could finish her answer,

Butler exploded and started yelling at her.  (*Id.*)  Butler backed her against the wall

while shaking his fist, cussing at her, and spitting on her in the process.  (*Id.*)  He

then went back to his office, and slammed the door so hard a clock fell off the wall

and broke.  (*Id.*)  Butler did apologize to Plaintiff the following day.  (Doc. 21-8.)

/ / /

Rowe was present during the scene and confirmed Plaintiff's version of events.  (Doc. 21 at ¶ 146, Doc. 2108 at 1.)  Rowe called Butler's behavior unprofessional, and described Butler as an abusive husband – one "who always brings flowers to soothe things over but eventually you know he will get abusive again." (*Id.*)

On May 7, 2014, Plaintiff sent an email to Roggentine, Rowe, and Human Resources Representative, Tamra Wilson ("Wilson") about Butler.  (Doc. 21 at ¶¶ 53, 147; Doc. 21-8 at 2.)  Plaintiff reported two episodes where Butler made comments about "S & M toys" and "whips and chains" that made her uncomfortable, and that she felt were inappropriate.  (*Id.*)  Plaintiff also stated that she walked on egg shells around Butler, and was fearful to say anything to him or ask questions because she never knew what the response would be.  (*Id.*)  She concluded that "I have NEVER worked for an individual like him and I can say I have NEVER been afraid of my boss!!!!" (*Id.*)

TKI, along with Philipps 66, conducted an investigation into Plaintiff's 2014 complaints against Butler.  (Doc. 21 at ¶ 55.)  As part of the investigation, TKI flew Plaintiff to Phoenix.  (*Id.*)  Butler and Rowe were also interviewed.  (*Id.* at ¶¶ 148, 150.)

During the investigation, Rowe told TKI management that Butler was inconsistent with how he treats people; that questioning him would trigger

retribution or a negative outcome; and that he berated Plaintiff a lot and would get red-faced.  (*Id.*; Doc. 21-10.)  Rowe stated he understood why Plaintiff felt unsafe, uncomfortable, and scared of Butler.  (*Id.*)  Rowe further opined that as of that time, Plaintiff was the best office manager they have had in a few years, and that she was following and succeeding in her performance improvement plan.  (*Id.*)  Rowe also told Wilson that Butler was prone to rash and strange outbursts, and that when he feels like he is correct, he is a bully and will call staff liars and belittle them.  (Doc. 21 at ¶ 149; Doc. 21-11.)  Rowe also stated that he believed Butler's "whips and chains" comment was directed specifically to Plaintiff, although he did not feel it was intended to be sexual in nature.  (*Id.*)  Rather, he believed Butler was "trying to get her motivated and pick-up the speed of work," and the comment may have been taken out of context.  (Doc. 21-11 at 1.)

The investigation concluded Butler's managerial behavior was lacking and unprofessional at times; his behavior was not up to the standards that Phillips 66 had for its managers; and that Phillips 66 was going to place Butler on a training plan or program to improve his managerial style.  (Doc. 21 at ¶¶ 56, 151.)

Following her complaint in 2014, Plaintiff did not make any additional complaints to Human Resources.  (Doc. 21. at ¶ 57.)

After her 2013 performance evaluation, Plaintiff continued to make errors in 2014 and 2015.  (Doc. 21 at ¶¶ 58-73.)  In April, 2014, for example, Plaintiff

improperly designated railcars as "clean" when they were not.  (*Id.* at 58; Doc. 18-12 at 1.)  In August 2014, September 2014, and December 2014, she made errors with regard to recording the weight of trucks, and entering weights in connection with her inventory duties.  (*Id.* at ¶ 59, 60; Doc. 18-12 at 2-8.)

Her errors continued into 2015, prompting Quinton to send Plaintiff numerous emails and speak with her regarding inventory discrepancies that Quinton had identified.  (Doc. 21 at ¶ 61; Doc. 18-13.)  On April 10, 2015, Quinton sent an email to Plaintiff and reminded her that it was her responsibility to ensure that inventory balances match.  If they did not, it was Plaintiff's job to determine why and fix the issue.  (Doc. 21 at ¶ 63; Doc. 18-13 at 7-8.)  Quinton also told Plaintiff "[i]f you feel you do not know how to do this let me know and we can go over it again."  (*Id.*)  Quinton sent a copy of the email to Solano to document Plaintiff's continued performance deficiencies, and asked that a copy be put in Plaintiff's file.  (Doc. 21 at ¶ 67; Doc. 18-1 at 25.)

Plaintiff was aware at this time that Quinton was frustrated with her due to errors related to inventory, and Plaintiff pledged to do her best to make sure the numbers were correct.  (*Id.* at ¶ 65; Doc. 18-13 at 7-8.)  She responded that she would "make sure the numbers are right on before I go on to the next day."  (*Id.*)

Despite her pledge of accuracy, Plaintiff continued to make errors that Quinton had to personally resolve.  (*Id.* at 66, 68.)  For example, Quinton found

additional inventory discrepancies in May 2015 and June 2015 that required her intervention and assistance.  (Doc. 21 at ¶ 68; Doc. 18-13 at 12-17.)  Quinton noted in June that "inventory is a mess, every product is off," and stated "[w]e need to talk about inventory, again."  (Doc. 18-13 at 17.)  In August 2015, Plaintiff contributed to delays related to submitting invoices that could negatively affect TKI's and Jupiter Sulpher's reputations with their customers.  (Doc. 21 at ¶ 69; Doc. 18-1 at 35-38.)  In November 2015, Quinton had to follow up on a request she had sent Plaintiff a month earlier regarding Bills of Lading which were not timely posted.  (Doc. 21 at ¶¶ 72-73; Doc. 18-1 at 39-40.)

Plaintiff continued to make errors in 2016.  (Doc. 21 at ¶ 79.)  On March 2, 2016, Quinton sent an email to Plaintiff regarding an on-going inventory issue. (*Id.*; Doc. 18-4 at 2-3.)  That same day, Rowe sent Quinton an email stating that he would address the re-occurring batch inventory issue with Plaintiff, and noted that Plaintiff "has shown that she can be too quick in passing the blame or to deflect problems she has caused."  (Doc. 18-14 at 1.)

On March, 7, 2016, Plaintiff received her Annual Performance Evaluation for the year 2015.  (Doc. 21 at ¶ 157; 21-9.)  Despite her numerous errors in 2015, Plaintiff received a "Meets Expectations" rating on four out of five categories. (*Id.*)  The Evaluation noted Plaintiff was competent in understanding her job and responsibilities.  (*Id.*)  With regard to inventory, the Evaluation stated Plaintiff

understood "the precision needed during inventory calculations while ensuring the plant inventory and SAP inventories match," but noted that "the ordering of Ammonia has been challenging and continues to require extra input from the front office team." (*Id.*) The Evaluation stated Plaintiff needed improvement in the area of avoiding office gossip and politics. (*Id.*) The stated performance expectations for Plaintiff going forward included increasing her understanding of rail yard organization, railcar tracking, and proper railcar ordering, as well as increasing her knowledge of how SAP works and understanding the numbers which go into plant production tracking. (*Id.*) Plaintiff was given a 1.5% merit bonus. (*Id.*)

The next day, on March 8, 2016, Quinton brought another mistake to Plaintiff's attention regarding an improperly used Bill of Lading. (Doc. 21 at ¶ 80; Doc. 18-14 at 4.) A customer had received 2 copies of the same Bill of Lading with different weights. (*Id.*)

In March 2016 and April 2016, additional mistakes regarding Bills of Lading were brought to Plaintiff's attention and had to be corrected. (Doc. 18-14 at 5-13.)

On May 23, 2016, Quinton traveled to Billings to address the on-going inventory problems at the Billings plant. (Doc. 21 at ¶ 83; Doc. 18-1 at 47.) Quinton reviewed the inventory process with Plaintiff on May 24 and 25, 2016, and thought she was making headway. (Doc. 18-1 at 47.) But Plaintiff called in

sick on the 26th, and was on vacation the following day, and thus unavailable for further review and consultation.  (*Id.*)

On June 2, 2016, Lorelie Cox ("Cox") advised Quinton and Roggentine that she was having communication issues with Plaintiff relating to shipments of railcars.  (Doc. 21 at ¶ 82; Doc. 18-14 at 19-20.)  Cox stated she was "simply not going to put up with it any longer," and added "[t]his impacts my job, takes more time out of my day forcing me to scramble not to mention I look like an idiot to [the customer]."  (*Id.*)

On June 3, 2016, Butler sent Quinton and Roggentine an email stating Plaintiff was continuing to make inventory mistakes.  (Doc. 18-14 at 21.)  Butler stated he was reviewing the inventory before sending it out, and finding most of the omissions, but some were missed.  (*Id.*)  He indicated changes were being made to the plant process to try and add more checks to improve their work quality.  (*Id.*)

On June 6, 2016, Quinton sent Roggentine an email about her concerns regarding the inventory issues at the Billings facility.  (Doc. 21 at ¶ 83; Doc. 18-1 at 47.)  Quinton also pointed out that in addition to repeated issues with inventory, there were unacceptable problems with maintenance and shipments, and ongoing issues with lack of communication.  (Doc. 18-1 at 47.)  Quinton relayed her opinion that "Billings requires an employee that will ensure that all documentation

is done in a timely manner and accurately, is able to communicate in a timely and professional manner and is reliable, especially as we continue to grow and add responsibilities to that position. I know everyone makes mistakes however, a consistent lack of quality work has made Billings unreliable and difficult to work with." (*Id.*)

On July 26, 2016, Rowe sent Quinton an email noting there were additional inventory problems. (Doc. 18-1 at 49.) He stated that Plaintiff had "backflushed production before he had the chance to verify the inventory numbers," and that there would be "a number of reversals today." *(Id.)*

Plaintiff does not dispute the inventory discrepancies identified by Quinton, and admits to making mistakes in inventory. (Doc. 21 at ¶ 62; Doc. 18-3 at 97.) But Plaintiff points out that Butler and Rowe's job duties included helping her diagnose problems, and verifying that inventory numbers were correct. (*Id.* at ¶¶ 115-118.) Plaintiff also contends things outside of her control contributed to the inventory errors, including that Butler had the ability to change inventory levels, and that some of the data she entered came from Operators and Loaders who made mistakes or did not always turn in their paperwork. (*Id.* at ¶¶ 111, 115, 120-121, 159-162.)

Plaintiff was ultimately terminated on October 7, 2016. (Doc. 21 at ¶ 86; Doc. 18-16.) In her termination letter, TKI advised Plaintiff she was terminated

based on work performance issues, including her issues with inventory.  (*Id.*)  The letter also indicated that Plaintiff had periodic attendance issues.  (Doc. 18-16.)  Solano drafted Plaintiff's termination letter, with input from Roggentine and Quinton.  (*Id.* at ¶ 87.)

Roggentine and Tryon made the decision to terminate Plaintiff.  (Doc. 21 at ¶ 89.)  Butler did not play a role in the decision to terminate Plaintiff, although he did provide input and was in support of her termination.  (*Id.* at ¶ 90; 164.)  Butler also left the Billings plant in October 2016.  (*Id.* at 167.)

## II.   DISCUSSION

TKI argues summary judgment is proper in this case because the undisputed facts demonstrate it had good cause to terminate Plaintiff for work performance issues; its reason for terminating Plaintiff's employment was not false or pretextual; Plaintiff's retaliation claim is preempted; and even if it is not, Plaintiff cannot establish a causal link between her complaints about her supervisor and her termination.

In response, Plaintiff argues genuine issues of material fact exist regarding whether there was good cause for her termination; whether the stated reasons for her termination are pretextual; and whether TKI retaliated against Plaintiff for reporting public policy violations.

/ / /

A.    **Legal Standard**

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

/ / /

18

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact.  *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995)).

**B.     Wrongful Discharge Claim**

Montana's Wrongful Discharge from Employment Act ("WDEA"), states:

(1) A discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
>
> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
>
> (c) the employer violated the express provisions of its own written personnel policy.

Mont. Code Ann. § 39-2-904.  Here, Plaintiff alleges her discharge was wrongful because it was not for good cause, and was in retaliation for reporting a violation of public policy.

1.     <u>Good Cause for Termination</u>

The WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reasons."  Mont. Code Ann. §

39-2-903(5).  A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and…must have some logical relationship to the needs of the business."  *Baumgart v. State of Montana*, 332 P.3d 225, 231 (Mont. 2014) (quoting *Sullivan v. Continental Const. of Montana, LLC*, 299 P.3d 832, 835 (Mont. 2013)).

A court may not substitute its judgment for an employer's discretion in employment matters: "[i]t is inappropriate for courts to become involved in the day-to-day employment decisions of a business."  *McConkey v. Flathead Elec. Corp.*, 125 P.3d 1121, 1126 (Mont. 2005).  However, the Montana Supreme Court has clarified that:

> An employer's legitimate right to exercise discretion over whom it will employ must be balanced [] against the employee's equally legitimate right to secure employment.  The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business.

*Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 8 (Mont. 1993)).

 "To defeat a motion for summary judgment on the issue of good cause, the employee may *either* prove that the given reason for the discharge is not good cause in and of itself, *or* that the given reason is a pretext and not the honest reason for the discharge."  *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (emphasis added) (quotations omitted).

TKI maintains that it had good cause for terminating Plaintiff as a matter of law based on her failure to satisfactorily perform her job duties. TKI argues it terminated Plaintiff based on her documented serious, persistent, and continuous performance deficiencies that negatively affected TKI's business interests. Plaintiff responds that her discharge was not for good cause. Plaintiff argues she was not properly trained; she was only subject to disciplinary action once and she otherwise had good performance reviews; and that her alleged mistakes were caused by others.

The Montana Supreme Court has recognized that an employer may terminate an employee for poor performance. *See e.g. Mysse v. Martens*, 926 P.2d 765, 771 (Mont. 1996) (finding there was good cause to terminate employee who refused to perform her job duties); *Miller v. Citizens State Bank*, 830 P.2d 550, 551-52 (Mont. 1992) (holding employer had good cause to terminate employee who failed to implement new procedures and delayed completing assigned tasks); *Sullivan v. Cont'l Constr. of Mont., LLC*, 299 P.3d 832, 837 (Mont. 2013) (affirming summary judgment for employer who terminated employee for failing to fulfill his job requirements and based on complaints of other employees).

Here, Plaintiff's job duties included maintaining and updating inventory records, coordinating shipping activities for the plant, handling purchase orders, and performing a variety of clerical and human resources related tasks. (Doc. 21 at

¶¶ 12-16; Doc. 18-3 at 21-26, 31-32.)  Plaintiff admitted at her deposition that it was important to maintain accurate inventory (Doc. 18-3 at 28), and that her job duties required her to identify errors in inventory and fix any resulting discrepancies.  (Doc. 21 at ¶¶ 31, 33; Doc. 18-3 at 33, 77, 81-82.)

TKI has presented substantial evidence of Plaintiff's performance deficiencies related to these duties, including the production of numerous emails from 2014 through 2016 documenting her errors.  (Docs. 18-1 at 10-49; 18-8; 18-9; 18-10; 18-12; 18-13; 18-14.)  Plaintiff has admitted she made mistakes in performing her inventory duties during her employment (Doc. 21 at ¶ 91; Doc. 18-3 at 97), and does not dispute the mistakes identified in the emails.  (Doc. 21 at ¶ 62; Doc. 18-3 at 48, 53, 57, 69-70, 71-75, 80, 83-87, 90-93.)  It is also apparent that Plaintiff's performance impacted others in the organization who were repeatedly required to remedy the problems created by Plaintiff's errors, and that her errors impeded the efficiency and quality of TKI's operation at the Billings facility.  Thus, TKI has established good cause for terminating Plaintiff based on her failure to satisfactorily perform her job duties.

Plaintiff argues, however, that TKI did not have good cause to terminate her because TKI did not provide her with adequate training.  Plaintiff acknowledges that she received training when she was first hired, and throughout her employment.  (Doc. 18-3 at 15-19.)  But she argues the inventory training was

insufficient because no other plant used the same inventory program as the Billings plant, and there was no one available to train her.  Nevertheless, Plaintiff admitted in her deposition she was able to "figure it out" during her time at the facility, and ultimately she gained the knowledge and experience necessary to perform her job as an Office Manager.  (Doc. 18-3 at 20; 18-3 at 20.)  Therefore, the Court finds the adequacy of Plaintiff' training does not create an issue of material fact, because it is undisputed that by the time Plaintiff was terminated, she had acquired the knowledge to perform the duties of her job.  The problems with Plaintiff's performance of her duties nevertheless continued.

Plaintiff also argues TKI lacked good cause to terminate her because she received favorable performance evaluations and merit increases for the years 2013 and 2015, and was not on a performance improvement plan at the time of her termination.  But an employer may terminate an employee for good cause, even if the employee has received good performance evaluations.  *See Baumgart*, 332 P.3d at 230-233.  A satisfactory performance evaluation does not provide a guarantee of future employment regardless of the employee's performance.  Here, the evidence is undisputed that following Plaintiff's last performance evaluation in for 2015, she continued to regularly make inventory and shipping errors into 2016.  (*See* Docs. 21 at ¶¶ 79-83; 18-1 at 47, 49; 18-14 at 1-14, 19-21.)

/ / /

23

Further, Plaintiff's reliance on *Arnold v. Yellowstone Mountain Club*, 100 P.3d 137 (Mont. 2004) and *Andrews v. Plum Creek Mfg. L.P.*, 27 P.3d 426 (Mont. 2001) is unavailing.  In *Arnold*, the Plaintiff was not fired for performance issues. She was terminate based upon a single incident where she allegedly used profane language and walked out of a meeting with her supervisor.  Aside from that incident, Plaintiff had no prior disciplinary problems, and she presented evidence showing she had performed her duties well.  *Arnold*, 100 P.3d at 141-42.  Here, Plaintiff's documented errors in the performance of her duties began early in employment, and continued to regularly occur throughout her tenure at TKI.

*Andrews* is also distinguishable.  The Plaintiff in *Andrews* presented evidence that she was provided no supervision, no job evaluations, no written job standards, and no training.  *Andrews*, 27 P.3d at 428.  In addition, her termination was based on the result of a single audit, without providing her any opportunity to correct any performance deficiencies brought to light by the audit.  Here, Plaintiff's termination was based on a series of errors, and she was provided multiple opportunities to correct deficiencies in her performance.  Furthermore, unlike the present case, the Montana Supreme Court found that there was a question of fact in *Andrews* as to whether the Plaintiff admitted she failed to satisfactorily perform her job duties.  *Id.  Compare* Doc. 21 at ¶ 62; Doc. 18-3 at 97 ("Q: Do you think anything was your fault with regard to the decision to

24

terminate your employment? A: Yes, I take some responsibility for some mistakes, of course I do, in inventory.").

Finally, Plaintiff attempts to shift the blame for her admitted mistakes to others. Plaintiff argues a number of things outside her of control, such as loaders forgetting to turn in paperwork, or operators writing down incorrect tank numbers, threw off inventory numbers. Yet, Plaintiff conceded at her deposition that it was possible to catch such errors. (Doc. 18-3 at 38-40.) Plaintiff also asserts that her inventory responsibilities were monitored by Butler and Rowe. But Plaintiff testified that it was ultimately her job to identify and correct discrepancies. (*Id.* at 81-82.) Plaintiff further asserts Butler made changes to the inventory on a regular basis, which caused the inventory numbers to be off. In support of this assertion, Plaintiff recounted a single incident in 2015, during which Butler allegedly stated he was "cookin' the books." (Doc. 18-3 at 43.) Plaintiff admitted, however, that she does not know how Butler made the alleged changes, what particular changes he made, how often he made changes, or what incentive, if any, he would have for changing the inventory. (Doc. 18-3 at 41-43, 208; Doc. 21-1 at 83-84.) Accordingly, the Court finds Plaintiff's speculation that Butler falsely manipulated inventory data does not give rise to a genuine issue of material fact.

In sum, the Court finds that Plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact as to whether TKI had good

cause to terminate Plaintiff for her repeated and documented performance deficiencies.

      2.    <u>Pretext</u>

Even when an employer has good cause to terminate an employee, the employee's claim may survive summary judgment if she can show there is a genuine issue of material fact as to whether the reason she was fired was pretextual or dishonest. *Becker*, 191 P.3d at 441. To defeat summary judgment on the issue of pretext, "the employee 'must prove that the given reason for the discharge…is a pretext and not the honest reason for the discharge.'" *Arnold v. Yellowstone Mountain Club, LLC*, 100 P.3d 137, 142 (Mont. 2004) (quoting *Mysses*, 926 P.2d at 770). The employee must present some evidence in the record substantiating his claim of pretext; "mere denial or speculation will not suffice." *Johnson*, 152 P.3d at 734-735.

Plaintiff maintains TKI actually terminated her in order to protect its partnership with Phillips 66. Plaintiff asserts it can be inferred that TKI had an incentive to terminate her because her complaints against Butler risked upsetting TKI's lucrative business arrangement with Phillips 66. Plaintiff also asserts that her termination letter demonstrates pretext. In the termination letter, TKI cited two reasons for discharging Plaintiff: (1) the failure to fully grasp components of her role, including inventory and (2) attendance issues. (Doc. 18-16.) Plaintiff argues

she had sick and vacation leave available at the time she was fired.  Therefore, she surmises the termination letter demonstrates TKI's stated reasons were "completely bogus" and pretextual.  In response, TKI contends Plaintiff has failed to show that its justification for terminating her was pretextual.

The Court finds there are no factual issues relevant to the issue of pretext which would preclude summary judgment.  First, Plaintiff offers nothing more than mere speculation that TKI's motive for terminating her was to protect its business partnership.  Plaintiff's last formal complaint against Butler was made in 2014.  (Doc. 21 at ¶¶ 52, 57.)  Plaintiff was terminated in 2016.  (*Id.* at ¶ 86.)  Thus, there was no temporal nexus between Plaintiff's complaints against Butler and her termination.  Plaintiff's theory is not supported by any other factual basis in the record.

Second, the attendance issues referred to in the termination letter related to the timing, not the amount of Plaintiff's leave.  Solano testified that TKI management felt Plaintiff had too many unexpected and unplanned absences year in and year out.  (*See* Doc. 21-4 at 21.)  This testimony is consistent with her 2013 and 2015 performance evaluations which both note that Plaintiff "had been coached on managing her leave and vacation time."  (21-9 at 2.)  Thus, the fact Plaintiff had accrued leave does not demonstrate TKI's cited reasons for

terminating Plaintiff were pretextual.[2]

Because Plaintiff has failed to come forward with sufficient evidence to create an issue of fact regarding good cause and pretext, TKI is entitled to summary judgment on her WDEA claim under Mont. Code Ann. § 39-2-904(1)(b).

3.   Retaliation for Reporting a Violation of Public Policy

A discharge is wrongful under the WDEA if it "is in retaliation for refusal to violate public policy or for reporting a violation of public policy."  Mont. Code Ann. § 32-2-904(1)(a).  Good faith "whistle blower[s]" are protected, regardless of whether the report results in a citation or investigation.  *Motarie v. N. Mont. Jt. Refuse Disposal Dist.*, 907 P.2d 154, 157 (Mont. 1997) (citation omitted).  "Public policy" is defined as "a policy in effect at the time of the discharge concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule."  Mont. Code Ann. § 39-2-903(7).  To overcome a motion for summary judgment, a plaintiff must present evidence showing that she was discharged because she reported a violation of public policy.  *Moe v. Butte-Silver Bow Co.*, 371 P.3d 415, 426 (Mont. 2016).  The WDEA exempts from its coverage discharges that are subject to other state or federal statutes that provide a procedure or remedy for contesting the dispute, including statutes that "prohibit unlawful

---

[2] The Court also notes that, while Plaintiff may have had a balance of leave time at the time of her termination, she did obtain a donation of 80 hours of sick time in July 2013 by her co-workers.

discrimination based on race, national origin, sex, age, disability, creed, religion, political belief, color, marital status, and other similar grounds." Mont. Code Ann. § 39-2-912.

TKI argues Plaintiff's retaliation claim fails as a matter of law because Plaintiff's complaints regarding Butler were based on sex and disability discrimination, and therefore must be brought under the Montana Human Rights Act ("MHRA") or Title VII of the Civil Rights Act of 1964, and not the WDEA. Plaintiff counters that her retaliation claim is not based on any protected activity relating to disability or sex discrimination.

Plaintiff contends TKI unlawfully terminated her for reporting that Butler made threats to fire her without good cause, lied about having approval to fire her, created a hostile work environment due to his anger, temper and mood swings, outwardly showed hostility in the workplace, threatened violence against her, and altered inventory numbers. Although Plaintiff mentioned in her deposition that Butler made a comment about sexual matters (Doc. 18-3 at 65), the record reflects that her complaints regarding Butler's behavior centered on his temper and her fear of him, not sexual harassment. (*See* Doc. 21-7 at 2; Doc. 21-8.) For example, in March 2014, Plaintiff reported to human resources an incident where Butler allegedly exploded and yelled and cussed at her, and was visibly shaking in anger. (Doc. 21-8 at 1.) Thus, the gravamen of Plaintiff's complaints about Butler do not

appear to be centered on sex or disability discrimination.  Viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff's retaliation claim is not exempted from the WDEA.

Assuming Plaintiff's retaliation claim is not preempted, the Court nevertheless finds TKI is entitled to summary judgment.  TKI persuasively argues Plaintiff has failed to present any evidence to establish a causal relationship between her complaints about Butler and her termination.[3]

Plaintiff's retaliation theory is negated by the timing of her termination.  It is undisputed that Plaintiff was terminated over two years after she made her last complaint to human resources about Butler.  (Doc. 21 at ¶ 57.)  Plaintiff asserts that she regularly submitted complaints about Butler, but she acknowledged in her deposition that she did not make any formal complaints about Butler after May 2014.  (Doc. 18-3 at 68.)  The only additional complaint Plaintiff specifically identifies is a May 2016 report she claims to have made to Quinton regarding Butler "cookin' the books."  (Doc. 21-1 at 39-40.)  Even assuming Plaintiff reported to Quinton in May 2016 that Butler was allegedly improperly altering

---

[3] TKI asserts Butler, who was the sole target of Plaintiff's public policy complaints, did not have authority to terminate her, and therefore argues Plaintiff cannot establish causation.  The Court rejects this argument as irrelevant.  The issue is not Butler's knowledge of Plaintiff's complaints or his involvement in her termination.  The focus of the inquiry is on whether TKI retaliated against Plaintiff, not whether Butler retaliated against her.

inventory records, the five month period between that report and her termination still does not raise an inference of causation sufficient to defeat summary judgment.  *See e.g. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (holding 18 month lapse between protected activity and adverse employment action was too long to give rise to an inference of causation); *Peters v. Aramark Uniform & Apparel, Inc.*, 316 Fed.Appx. 568, 570 (9th Cir. 2008) (holding an 11 month time lapse between employee's complaint about an allegedly unlawful company policy and his termination did not create a genuine issue of material fact sufficient to defeat summary judgment); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding 4 months was too long); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (5 months was too long).  *Compare Kelley v. Billings Clinic*, 2014 WL 223377, *19 (D. Mont. Jan. 21, 2014) ("The Ninth Circuit generally has held that a period of less than three months between a plaintiff's protected activity and an adverse employment action is sufficient to raise an inference of causation.").

Additionally, as discussed above, TKI had good cause to terminate Plaintiff based on her deficient performance, which further undermines Plaintiff's claim that TKI's termination decision was retaliatory.  Plaintiff does not offer any other evidence of a retaliatory motive, apart from speculation and conjecture that TKI may have wanted to terminate Butler, but could not, so instead terminated Plaintiff

to appease Butler and/or Phillips 66.  (Doc. 20 at 22-23.)

The Court finds Plaintiff has failed to point to sufficient evidence to raise a genuine issue of material fact as to whether she was terminated in retaliation for reporting a public policy violation.  Accordingly, TKI is entitled to summary judgment on Plaintiff's WDEA claim under Mont. Code Ann. § 39-2-904(1)(a).

## III.   CONCLUSION

Based on the foregoing findings, **IT IS RECOMMENDED** that TKI's Motion for Summary Judgment (Doc. 16) be **GRANTED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED.**

DATED this 25th day of June, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge